FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 25  FH 12: 33
NORTHERN DIVISION

U S. DISTR. T. COURT
N.D. OF ALABAMA

SONYA D. JORDAN,                         )
                                         )
                    Plaintiff            )
                                         )
vs.                                      )        CASE NO. CV02-HGD-1188-S
                                         )
WAL-MART STORES, INC.,                   )
                                         )    **ENTERED**
                    Defendant            )

FEB 2 5 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant, Wal-Mart Stores, Inc. (Wal-Mart) [Doc. #13]. The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c). Defendant seeks summary judgment in its favor with respect to all claims asserted by plaintiff, Sonya Jordan, in this action. Defendant's motion includes exhibits and a brief. Plaintiff has filed evidence and a brief opposing the motion for summary judgment [Docs. #16 and 17], and defendant has filed a reply brief [Doc. #18]. The matter is now ready for disposition.

On May 10, 2002, plaintiff filed this lawsuit, alleging that defendant violated Title VII and 42 U.S.C. § 1981 by discriminating against plaintiff on account of her race. Plaintiff states in her complaint that she began employment with defendant on September 25, 1993, as a cashier. On May 12,

1998, plaintiff was 24 minutes late to work when a train stopped on the tracks and blocked her way.  Plaintiff alleges she called work to advise that she was running late due to the stopped train.  On May 29, 1998, plaintiff was terminated for attendance violations, including her tardy appearance on May 12, 1998.  Defendant's policy requires the accumulation of six points within six months before an employee may be terminated for unexcused absences and tardies.   However, plaintiff alleges that, based on defendant's method for assigning points for unexcused absences and tardies, plaintiff could only have had four points assigned to her for being late.  Plaintiff further alleges that similarly situated white employees with more points were not terminated, naming Rebecca Wilson (41 points), Dorothy Kendrick, Evelyn Wilson, Ruby Hagerdy and Martha Meadow.[1]

## FACTUAL BACKGROUND

Plaintiff, Sonya D. Jordan, an African-American female, was hired as a cashier at Wal-Mart Store 764 in September 1993.  She continued to work there in that capacity until she was terminated on May 29, 1998.  Jordan had several different supervisors during her tenure at Wal-Mart.  Her last two supervisors were Monteen Ashley, who supervised Jordan for a few months in late 1997 and early 1998, and Regeana Hinds, who supervised Jordan in 1998

---

[1] In her complaint, plaintiff identifies two these comparators as "Ruby Hagerdy" and "Martha Meadow."  The evidence submitted on the motion for summary judgment reflects that the correct names of these alleged comparators are Reba Hagerty and Martha Medders.

up to the time of her termination. Both Ashley and Hinds were Front-End Managers. Front-End Managers are hourly associates with supervisory authority. Jordan was terminated by Hinds.

Wal-Mart Store 764 had an attendance policy in place at the time of plaintiff's termination. [Plaintiff's Exh. 5, Supercenter Attendance Policy revised September 22, 1997]. That policy defined an "absence" as

> any time an Associate fails to report to work as scheduled, regardless of the reason, whether an Associate uses an income replacement benefit to offset lost work time, or whether the time is made up during that time period. Each instance an Associate has unscheduled, unapproved time away from work will be measured as an "absence."

[*Id.*].

The Supercenter attendance policy further provided that "Associates are expected to personally call a Salaried member of Management no less than one (1) hour prior to scheduled start time to report each day they will be absent. This, however, does not necessarily excuse the absence." [*Id.*]. The policy also stated that Associates should have no more than three absences in a rolling six-month period. [*Id.*]. This notification policy also was made applicable to tardy arrivals in the Wal-Mart Associate Handbook which stated that "[i]f you are not able to come to work, or will arrive at work past the time you are scheduled, you must **personally** notify your manager before your

3

scheduled time to report to work."  [Defendant's Exh. 3, Decl. of Monteen Ashley, at Exh. C, Wal-Mart Associates Handbook (1991)] (emphasis added).[2]

The policy also defined "tardy" as "any time an Associate does not report to their work area within ten (10) minutes of their scheduled start time. (The Family Medical Leave Act does not consider some tardies to be excused.)" [Plaintiff's Exh. 5, Supercenter Attendance Policy revised September 22, 1997]. It also provided that three tardies within a three-month period equals one absence. However, it further provides that "schedule adjustments" may excuse a tardy, if approved in advance, and that "[a] late arrival which occurs as a result of a Salaried Member of Management's decision to adjust a shift will not count as a tardy."  [*Id.*].  Thus, Wal-Mart managers have the authority to "manager approve" unexcused absences or tardies so that they do not count toward an associate's point total. [Defendant's Exh. 4, Decl. of Regeana Hinds, at ¶ 7].  Whether an otherwise unexcused absence or tardy appearance at work

---

[2] The Supercenter attendance policy, with a version date of September 22, 1997, requires personal notification to a salaried member of management no less than one hour prior to a scheduled start time.  This personal notification requirement is not addressed in the 1997 policy with regard to tardy occurrences.  It is only stated as a requirement in the Wal-Mart Associate Handbook, of which two different editions were produced and filed as evidentiary submissions. [*See* Defendant's Exh. 5 at Exh. C, Wal-Mart Associate Handbook (July 1991), at 9; Defendant's Exh. 1, Jordan Depo., at Exh. 5, Wal-Mart Associate Handbook, at 14 (apparently in effect subsequent to 1993 based on citation of Wal-Mart history, including event occurring in 1993, at 6)].  There is no comment by either party about this anomaly or any claim that the 1997 issue of the Supercenter attendance policy, which contains no personal notification requirement for a tardy appearance, replaced the earlier policies in the Associate Handbook, which specifically included this requirement.  Because the policies in each do not directly conflict with one another, the court will assume they were all part of an overall Wal-Mart attendance policy.

4

is excused by a manager depends on the reason for the tardiness or absence.

[Ashley Depo. at 44-45].

Attendance is tracked on a point system. An unexcused absence occurring from Monday through Thursday is counted as one point while an unexcused absence occurring Friday through Sunday counts as two points. In addition, the policy states:

> Associates should have no more than three (3) absences in a rolling six (6) month period. Managers should coach Associates who do not adhere to the attendance and/or tardiness guidelines. **Coaching for Improvement** should be initiated as follows:

| Absences/<br>Points Accrued | Action |
|---|---|
| **3** | Verbal |
| **4** | Written Coaching |
| **5** | Decision Making Day |
| **6** | Termination |

[Plaintiff's Exh. 5, Supercenter Attendance Policy revised September 22, 1997] (emphasis added). Despite the existence of an attendance policy, the record evidence reflects that, in practice, there was no magic number of points beyond which an employee was automatically terminated by Wal-Mart. [*See, e.g.*, Plaintiff's Exh. 12 (reflecting Wal-Mart cashier Susan Forister receiving Decision-Making Day, rather than termination, after accruing 22 points)].

The Wal-Mart Associate Handbook describes the Coaching for Improvement process as one designed to inform an associate when she or he

5

is not meeting the requirements and expectations of their position. It notes

as follows:

> If an associate's performance or conduct falls below
> the expectations of his or her position, then the
> associate is informed of the problem and encouraged
> to take responsibility for his or her actions. This
> process will include developing a plan of action for
> improving performance to the required level, or
> changing conduct.

[Defendant's Exh. 5].

The Coaching for Improvement system typically results in an errant

employee receiving verbal coaching, written coaching, a Decision-Making Day

and, finally, termination. [Hinds Decl. at ¶ 4]. A Decision-Making Day is a paid

day off that associates with disciplinary or performance problems are granted

to consider whether they will improve their conduct or performance.

Any violations occurring after an associate's Decision-Making Day *can*

(but will not always) result in termination. [*Id.*]. The manager decides

whether the subsequent offense warrants termination. [Ashley Depo. at 36].

This, in turn, is dependent upon the employee's level of coaching at the time

he or she accrues six or more points. [*Id.* at 25-27].

Attendance is tracked by computer. Absences and tardies are reflected

on two separate reports that are computer-generated. [Hinds Decl. at ¶ 10].

The computer system automatically determines when an associate is absent or

tardy based on the number of days and hours that the associate had been

scheduled to work. [Ashley Depo. at 12]. This report generally is monitored

6

by the Front-End Manager or the Lead Customer Service Manager. [*Id.*]. Regeana Hinds, the Front-End Manager who terminated Jordan, relied on the attendance tracking reports to determine Jordan's point total and history of unexcused absences and tardies. [Hinds Decl. at ¶ 10].

By her own admission, Jordan was tardy and absent without excuse on a number of occasions. She is unable to recall the exact number of times she was tardy or absent, nor can she provide an estimate. [Jordan Depo. at 56-57]. Jordan's 1996 and 1997 evaluations reflect that Jordan had problems with attendance. [*Id.* at Exhs. 2, 13].

Jordan received coaching on May 7, 1997, for her violations of the attendance policy. On that occasion, it was noted that she had 17 points. It was further noted that another violation would result in a Decision-Making Day. [*Id.* at 12]. Her August 1997 evaluation notes that plaintiff had 20 points in attendance tracking, mainly for tardies and unexcused absences. [*Id.* at 13]. Jordan did not receive coaching or a Decision-Making Day at that time.

The Wal-Mart attendance tracking records for Jordan reflect that, in the six months preceding May 12, 1998, she accumulated attendance points for tardies and absences. Jordan was 15 minutes late on November 13, 30 minutes late on November 24, and 12 minutes late on November 25, 1997. [Hinds Decl. at ¶ 13, Exh. B]. Under the Wal-Mart attendance policy, the result of being tardy on these three occasion was that Jordan was assessed one

7

attendance point. [*Id.* at Exh. C]. [Six-Month Rolling Total Attendance Points: one point].

Jordan was nearly two hours late on December 4, 20 minutes late on December 6, and nearly two hours late again on December 12, 1997. [*Id.* at Exh. B]. These three tardy incidents equal one attendance point. [*Id.* at Exh. C]. [Six-Month Rolling Total Attendance Points: two points].

Jordan had an unexcused absence from work on December 16, 1997. [*Id.* at Exh. A]. This constitutes one point in Jordan's attendance tracking report. [*Id.* at Exh. C]. [Six-Month Rolling Total Attendance Points: three points].

Jordan was 11 minutes late on December 13, 16 minutes late on December 18, and 16 minutes late on December 23, 1997. [*Id.* at Exh. B]. These three tardy incidents equal one attendance point. [*Id.* at Exh. C]. [Six-Month Rolling Total Attendance Points: four points].

Plaintiff was one hour and 45 minutes late on January 2, 25 minutes late on January 10, and more than one hour late on January 14, 1998. [*Id.* at Exh. B]. These three tardy incidents equal one attendance point. [*Id.* at Exh. C]. [Six-Month Rolling Total Attendance Points: five points].

Jordan was one hour and one minute late on March 18, 27 minutes late on March 25, and 24 minutes late on May 12, 1998. [*Id.* at Exh. B]. These three tardy incidents equal one attendance point. [*Id.* at Exh. C]. [Six-Month Rolling Total Attendance Points: six points].

8

Jordan disputes the accuracy of these records and maintains that she was not absent or tardy after a coaching session on January 10, 1998, until the incident on May 12, 1998, when she was late after being blocked by a train. [Jordan Depo. at 43-46]. However, she has produced no evidence that the computer attendance tracking program was faulty or any other evidence to suggest its report regarding her attendance was incorrect.

On January 10, 1998, Jordan was coached again for attendance and tardiness. [Jordan Depo. at Exh. 10]. On that occasion, it was noted that Jordan had 21 points for her tardies and unexcused absences. On this occasion, she was given a Decision-Making Day and the Coaching for Improvement form made in conjunction with this event reflects that, "the next level of corrective action if this behavior/performance continues will be: Termination." Regeana Hinds, who had just begun working at Store 764, witnessed this coaching. Monteen Ashley was Jordan's Front-End Supervisor who conducted the coaching. [*Id.*].

On May 12, 1998, Jordan was again tardy. Jordan alleges that she was late because she was held up by a train. According to Jordan, when she realized she was going to be late, she went back by her home and asked her mother, also a Wal-Mart employee, to call in for her to let her employer know why she was going to be late. Jordan did not personally call as is required by Wal-Mart policy. [Hinds Decl. at Exh. C; Ashley Depo. at 15].

9

On May 29, 1998, Jordan was called to the office by Hinds. The meeting began with Hinds showing Jordan a computer printout which Hinds told Jordan reflected days she was absent or tardy. Hinds advised Jordan she was being terminated because of excessive tardies. [Jordan Depo. at 40-42]. Jordan testified that she told Hinds at that time that any absences reflected in the report were "old" absences (i.e., pre-dating the January 10, 1998, coaching session). [*Id.* at 41]. According to Jordan, Hinds then told Jordan to disregard the absences and that she was being terminated for tardiness. [*Id.* at 42]. Jordan advised Hinds that there were several other Caucasian employees who had more points than she did who were not terminated. [*Id.* at 47-48]. Hinds told her that she needed to focus on herself and that she was a good worker but that she was being terminated for being tardy. [*Id.* at 48].

## DISCUSSION

This matter is considered by the court pursuant to the provisions of Rule 56, Fed. R. Civ. P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to

10

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn

11

in his favor. *Id*. at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is, therefore, under this standard that the court must determine whether the plaintiff can meet her burden of coming forward with sufficient evidence as to each material element of her claim sufficient to permit a reasonable jury to find in her favor.

## Discrimination Generally

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In evaluating Title VII claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and, by the Eleventh Circuit in *Willis v. Conopco, Inc.*, 108 F.3d 282, 284-85 (11th Cir. 1997). Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253-54 & n.6, 101 S.Ct. at 1093-94 & n.6. Once a *prima facie* case has been established, the

12

burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. If a defendant carries its burden of producing legitimate, non-discriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff at all times retains the ultimate burden of persuading the trier of fact that the employer discriminated against the plaintiff. *Id.* at 253, 101 S.Ct at 1093.

> The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." *Burdine*, *supra*, at 253, 101 S.Ct., at 1093. In other words, is "the employer . . . treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n.15, 97 S.Ct. 1843, 1854, n.15, 52 L.Ed.2d 396 (1977). The *prima facie* case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco*, *supra*, 438 U.S., at 577, 98 S.Ct., at 2949. Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima*

13

> *facie* case, whether the plaintiff really did so is no
> longer relevant. The district court has before it all the
> evidence it needs to decide whether "the defendant
> intentionally discriminated against the plaintiff."
> *Burdine*, *supra*, 450 U.S., at 253, 101 S.Ct., at 1093.

*United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715,

103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).[3]

In order to establish a case under Title VII, a plaintiff may use three

different kinds of evidence of discriminatory intent: direct evidence,

circumstantial evidence or statistical evidence. The analytical framework and

burden of production varies depending on the method of proof chosen. If a

plaintiff can provide direct evidence of discriminatory intent, then the employer

must prove by a preponderance of the evidence that the same employment

decision would have been made in the absence of the discriminatory intent.

*Wall v. Trust Co. of Georgia*, 946 F.2d 805, 809 (11th Cir. 1991); *Standard v.

A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

## Disparate Treatment

A plaintiff alleging disparate disciplinary treatment makes out *prima facie*

case of discrimination "upon a showing (1) that plaintiff engaged in prohibited

conduct similar to that of a person of another race, color, sex, religion, or

national origin, and (2) that disciplinary measures enforced against the plaintiff

---

[3] The framework for analysis of a § 1981 claim is the same as for a Title VII claim. *See
Walters v. City of Atlanta*, 803 F.2d 1135, 1143 n.5 (11th Cir. 1986); *Whiting v. Jackson State
Univ.*, 616 F.2d 116, 121 (5th Cir. 1980).

14

were more severe than those enforced against the other person." *Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989); *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985); *see also, Wilmington v. J.I. Case Co.*, 793 F.2d 909, 915 (8th Cir. 1986) ("To establish a *prima facie* case, [plaintiff] had to show that he is a member of a protected class, that he was disciplined, and that the discipline imposed was harsher than that imposed on comparably situated whites."). *Cf. Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir. 1984) ("a plaintiff fired for misconduct makes out a *prima facie* case of discriminatory discharge if he shows that he was qualified for the job from which he was fired, and 'that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'") (quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1982)); *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.), *cert. denied*, 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980) ("With respect to discharge for violation of work rules, the plaintiff must first demonstrate by a preponderance of the evidence either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly.").

Plaintiff alleges that she was terminated for violations of the attendance policy while Caucasian employees who committed the same violations were either not disciplined or disciplined less severely. She names several individual

15

comparators. These include Rebecca Wilson, Dorothy Kendrick, Evelyn Wilson, Reba Hagerty, Martha Medders, Susan Forister and Judie Hartson.[4]

## Qualification for the Position

Defendant asserts that Jordan's attendance and tardiness violations precluded her from being qualified for a position of cashier at Wal-Mart, thus precluding her from establishing a *prima facie* case. [Doc. #13 at Exh. 5; Brief of Defendant at 18]. However, defendant's Associate Evaluation of plaintiff rates her ability as "above standard." [Jordan Depo. at Exh. 2]. One of her cited "overall strengths" is that she provided "great customer service." [*Id.*]. Wal-Mart's contention that Jordan was not qualified for her position lacks merit.

## Comparators

Defendant asserts that plaintiff has not made out a *prima facie* case because she failed to show that she was treated differently from similarly-situated non-minority employees. Plaintiff must show that there were employees, not within her protected class, who were similarly situated in all relevant respects but who were treated more favorably. *See Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998), *cert. denied*, 528 U.S. 809, 120 S.Ct. 39, 145 L.Ed.2d 36 (1999); *Holifield v. Reno*, 115 F.3d 1555, 1561

---

[4] After the completion of discovery, plaintiff named other comparators in addition to those named in her EEOC charge and initial complaint.

16

(11th Cir. 1997). In determining whether employees were similarly situated and more favorably treated, this court must consider whether the employees were treated in the same way as plaintiff. The adequacy of the comparators is crucial. *Marshall v. Western Grain Co., Inc.*, 838 F.2d 1165, 1168 (11th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1561.

Initially, the court notes that none of the computer-generated attendance or tardy records for Rebecca Wilson, Evelyn Wilson, Dorothy Kendrick, Reba Hagerty or Martha Medders have been submitted by Wal-Mart to corroborate their arguments that plaintiff's identified comparators were not similarly situated. Wal-Mart did not retain any of the computer printouts for any of the other cashiers working around the time of Jordan's termination, including most of plaintiff's named comparators. Plaintiff asserts that Wal-Mart has failed to preserve the computer-generated records that reflect the absence and tardiness of each of the named comparators and to provide them to plaintiff pursuant to legitimate document production requests. [Doc. #17, Plaintiff's Response, at 14]. Because of this, plaintiff asserts that her own testimony that E. Wilson and Kendrick were late on numerous occasions and were not disciplined should be sufficient to avoid summary judgment. [*Id.*]. In essence, plaintiff asserts that the only way to attempt to contradict Wal Mart's assertions

17

about the named comparators would be to obtain the attendance records for these employees to see how many points they actually had accrued, to see if any of the comparators received manager approval for their late arrivals, or to see what, if any, disciplinary action was warranted and taken or not taken against them. Since Wal-Mart did not preserve these records, plaintiff asserts, in effect, that the court should apply an adverse inference that the records Wal-Mart failed to preserve would have supported her contention that some employees were late on numerous occasions or otherwise violated the attendance policy without receiving discipline.

Wal-Mart states that it provided plaintiff with documentation pertaining to individuals who were coached for attendance and tardiness problems around the time of plaintiff's termination. However, because plaintiff cited only one alleged comparator in her 1998 EEOC charge, Wal-Mart did not maintain, and asserts it was under no duty to maintain, records regarding other individuals. [Doc. #18, Reply Brief of Defendant, at 10 n.2].

Plaintiff filed her EEOC charge within two months of her termination. She clearly asserted that she was unfairly discharged for allegedly violating the Wal-Mart attendance policy though a white female cashier had accumulated more attendance points than her and had not been disciplined. Title 29 C.F.R. § 1602.14(a) states:

> Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application

18

forms submitted by applicants and other records
having to do with hiring, promotion, demotion,
transfer, lay-off or termination, rates of pay or other
terms of compensation, and selection for training or
apprenticeship) shall be preserved by the employer for
a period of one year from the date of the making of the
record or the personnel action involved, whichever
occurs later. In the case of involuntary termination of
an employee, the personnel records of the individual
terminated shall be kept for a period of one year from
the date of termination. *Where a charge of
discrimination has been filed*, or an action brought by
the Commission or the Attorney General, against an
employer under Title VII or the ADA, *the respondent
employer shall preserve all personnel records relevant
to the charge or action until final disposition of the
charge or the action.* The term *"personnel records
relevant to the charge,"* for example, would include
personnel or employment records relating to the
aggrieved person *and to **all other employees
holding positions similar to that held or sought
by the aggrieved person*** and application forms or
test papers completed by an unsuccessful applicant
and by all other candidates for the same position as
that for which the aggrieved person applied and was
rejected. The date of final disposition of the charge or
the action means the date of expiration of the
statutory period within which the aggrieved person
may bring an action in a U.S. District Court or, where
an action is brought against an employer either by the
aggrieved person, the Commission, or by the Attorney
General, the date on which such litigation is
terminated.

[Emphasis added]. Thus, Wal-Mart's contention that it was under no duty to

maintain the attendance and tardy records regarding other cashiers is incorrect.

Once the EEOC charge was filed, Wal-Mart was under an obligation to maintain

the records for *all* other employees holding a similar position until the

disposition of the charge; this included Evelyn Wilson, Dorothy Kendrick, Rebecca Wilson and all other cashiers at Store 764.

The evidence most certain to prove or disprove plaintiff's claim was in the possession of Wal-Mart. The production of the attendance and tardy records from the computer-generated printouts would have made or destroyed plaintiff's case.

In *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376 (2d Cir. 2001), the Second Circuit Court of Appeals held that under similar circumstances, an adverse inference is warranted. It noted that, where the employer is required by law to retain the employee's records, *see* 42 U.S.C. § 2000e-8(c); 29 C.F.R. § 1602.14 (requiring retention for one year after termination), bad faith that might otherwise be required need not be shown to permit an adverse inference; intentional destruction satisfies the *mens rea* requirement. The only other requirement is that the party seeking the inference show that the destroyed records were relevant to the party's claim or defense. *Id*. at 383-84. *See also, Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 107-08 (2d Cir. 2001); *Favors v. Fisher*, 13 F.3d 1235, 1239 (8th Cir. 1994); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987). *Cf. Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 661 n.7 (5th Cir. 1983).

Clearly , the records sought by Jordan were relevant to her claim against Wal-Mart. Based on the failure of Wal-Mart to preserve the attendance and tardy records of plaintiff's identified comparators and other cashiers at Wal-Mart

20

Store 764, the court infers that the information would have been supportive of Jordan's allegations.

## Rebecca Wilson

Plaintiff proffers Rebecca Wilson as a person who was treated more favorably than she. Jordan alleges that Wilson told her, at some point in time, that she had accumulated 41 attendance points. Wilson told this to plaintiff in about January 1998 after Hinds became Front-End Manager. [Jordan Depo. at 49]. However, Wilson did not tell Jordan over what time period she accrued that number of points. [*Id.* at 49-50]. Monteen Ashley, District Manager Assistant, was Front-End Manager at store 764 and supervisor of both Wilson and Jordan in January 1998. Although no records of Wilson's point total for January 1998 have been submitted by Wal-Mart, according to Ashley, Wal-Mart records reflect that Wilson had seven points under the Wal-Mart attendance policy in May 1998, when she received a coaching for improvement. [Ashley Decl. at ¶ 7, Exh. A]. Thereafter, Wilson continued to accrue points and was terminated for excessive absenteeism and tardiness in January 1999. [Ashley Decl. at ¶ 9, Exh. B].

According to plaintiff, the fact of Wilson's eventual termination is irrelevant because she (Wilson) was terminated by Bruce Owens, not Hinds, and the termination occurred after Jordan was terminated. [Doc. #17, Plaintiff's Response, at 10]. Plaintiff also asserts that the records reflect that

21

Wilson was terminated after accruing nine points after her Decision-Making Day; whereas, she was terminated after accruing only two points after her Decision-Making Day. [*See* Ashley Decl. at Exh. B]. According to Jordan, if she had been given the extra seven points that were given to Rebecca Wilson, Jordan might never have been terminated. Jordan contends that this is further evidence that shows that Wilson was treated more favorably than plaintiff. [Doc. #17, Plaintiff's Response, at 11].

Defendant objects to the evidence regarding Wilson on the ground that it is inadmissible hearsay. There is no question that plaintiff's statement about what Rebecca Wilson told her is hearsay. Rule 801(c), Fed.R.Evid. However, otherwise inadmissible hearsay can be considered on a motion for summary judgment if it can be reduced to admissible evidence at trial. *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996). Although Jordan will not be able to testify at trial as to what Wilson told her about her attendance history, Wilson may do so herself. There is no basis in the evidence presented for the court to conclude that the declarant will not testify consistent with Jordan's representation. *See, e.g., Church of Scientology Flag Service Organization, Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993) (contents of newspaper articles admissible to avoid summary judgment where witnesses will likely be available to provide direct evidence at trial consistent with contents of articles). *But see Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1134-35 (11th Cir.

1996) (plaintiff cannot avoid summary judgment by submitting statement of *unknown* co-worker because it cannot be made admissible at trial).

However, as noted by defendant, there is no evidence of what period of time this alleged accumulation of attendance points by Wilson is supposed to have occurred. [Jordan Depo. at 49-50]. This number of points could be accumulated at a rate of less than six points per six-month time period and never result in any coaching for improvement or other discipline mandated by the Wal-Mart attendance policy. That is, if Wilson accumulated five points in a month and then went six months without another point being assessed, she would not be in violation of the attendance policy. She could repeat this process every seven months and amass 45 points over 63 months without having accumulated six or more points in any one six-month time period.

Thus, Jordan has not shown that Wilson is similar to her in every respect because she cannot show that she accumulated 41 points in any given six-month period without disciplinary action. Furthermore, although Jordan states that Wilson told her about her points accumulation in or about January 1998 while they were supervised by Hinds, Wilson did not tell her that these points were currently part of her attendance point totals. They could have been accumulated in any preceding time period, perhaps years before, and long since passed from her records as countable for purposes of discipline. Without this information, Jordan has not shown herself to be similarly situated with Wilson. However, the computer-generated records of Wilson's attendance which would

show this were not produced by Wal-Mart. Nevertheless, because there is sufficient evidence, outlined below, regarding the extent of Wilson's attendance problems and the discipline visited upon her as a result, the absence of these records are not essential to plaintiff's claim or defense.[5]

Defendant also asserts that Wilson was not treated differently from Jordan because Wilson also was terminated by Wal-Mart for excessive absences. Plaintiff believes this reasoning is flawed because Wilson was not terminated until more than six months after plaintiff's termination and because Wilson was terminated by a different supervisor. Jordan also notes that, at the time of her termination, Wilson had accumulated nine points subsequent to her Decision-Making Day while she only accumulated two points before she was terminated.

Jordan asserts that the fact that Wilson was terminated after Jordan filed her EEOC complaint and was terminated by a different supervisor affects the relevance of that fact. "Different supervisors may have different management styles that, while not determinative, could account for the disparate treatment that employees experience." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1312 n.7 (11th Cir. 1998). However, this works both ways. The fact that Wilson was terminated after accumulating nine points, rather than two points, is just as likely to be attributable to the fact that Wilson had a different

---

[5] The same cannot be said with regard to certain other comparators cited by Jordan, and the consequences of this are addressed below with respect to comparators Dorothy Kendrick, Evelyn Wilson, Martha Medders and Reba Hagerty.

24

supervisor when she eventually was terminated.   Because Wilson was terminated by a different supervisor more than six months after Jordan's termination, the facts surrounding her termination have no impact on Wilson's standing as an adequate comparator at the time of Jordan's termination.  The fact remains that Wilson had an attendance record strikingly similar to Jordan and, like Jordan, she was terminated after coaching and receiving a Decision-Making Day.

While there is no evidence that Wilson had 41 points on her attendance record at the time she was supervised by Hinds, the records which would disprove this claim were not maintained by Wal-Mart.  Jordan does not know the time period over which these points were accrued and, without these records, cannot say how many points, if any, Wilson had in January 1998.  However, other records that have been produced reflect that Wilson received coaching for improvement sessions in April and May 1998.  Evidence submitted reflects that, during May 1998 (the month Jordan was terminated), Wilson had a total of seven attendance points and received a coaching for improvement. [Ashley Decl. at ¶ 7, Exh. A].  She was terminated when she failed to improve, accumulating another nine points.  [*Id.* at Exh. B].  The records available thus reflect that Wilson was terminated after accruing a total of 16 points and undergoing two coaching sessions; whereas, Jordan received three coaching for improvement sessions before termination, receiving a coaching session rather than termination at one point, despite having accrued 21 attendance points.

25

[Jordan Depo., Exh 10]. Thus, despite the fact that Wilson accrued nine points after her Decision-Making Day, she was, nonetheless, terminated when she had fewer total attendance points than Jordan had when she was merely coached in January 1998. Therefore, there is no evidence that Wilson received more favorable treatment than Jordan.

### Evelyn Wilson and Dorothy Kendrick

Plaintiff also identifies Caucasian employees Evelyn Wilson (E. Wilson) and Dorothy Kendrick as employees who were frequently late but were not terminated. [Jordan Depo. at 47-48, 59, 62-63]. According to defendant, Kendrick and E. Wilson were school bus drivers whose tardiness was manager-approved and did not result in points accumulation. According to Regeana Hinds, their supervisor:

> Several associates at Store 764, including Dorothy "Dot" Kendrick and Evelyn Wilson, worked a second job as school bus drivers. Sometimes their Wal-Mart schedules would overlap with their bus schedules by a few minutes. After receiving their schedules, these associates would routinely inform me that they would be a few minutes late due to their bus driving duties. These tardies were manager approved schedule changes and, thus, did not contribute to the bus drivers' overall points total.

[Hinds Decl. at ¶ 8].

Wal-Mart asserts that because these tardy arrivals were approved, E. Wilson and Dorothy Kendrick were not similarly situated with Jordan. Plaintiff

26

testified that, in a cashiers' meeting, the cashiers were told that company policy was that being tardy because of a second job would not excuse being tardy for work.   However, this statement is double hearsay.   [See Rule 801(b), Fed.R.Evid.].  Jordan does not recall when this meeting occurred and is unsure who conducted the meeting, though she believes "Marlin" conducted it.  There is no written policy which addresses tardiness specifically related to second jobs. [See Plaintiff's Exhs. 5, 6, 11].  However, the policy clearly defined an "absence" as "any unapproved failure to report to work as scheduled, regardless of the reason." [Ashley Decl. at Exh. C, Supercenter Attendance Policy].   Thus, Marlin's alleged statement concerning what the Wal-Mart attendance policy states is hearsay and also incorrect.  See McMillian v. Johnson, supra.

The sworn testimony presented by Wal-Mart is that E. Wilson's and Dorothy Kendrick's bus-driving related tardiness was "manager-approved." In fact, Hinds testified that when she first began working at Store 764, she gave a certain amount of leeway to all associates, including Jordan.  In Jordan's case, Hinds testified that she "manager-approved" many of Jordan's violations of the Wal-Mart attendance policy. [Hinds Decl. at ¶ 7]. Plaintiff's attendance tracking report reflects that Jordan received such manager approval on 16 occasions between June 1, 1997, and March 26, 1998. [Jordan Depo. at Exh. 16].  Wal-Mart has not produced any records to corroborate Hinds' testimony

regarding her "manager approval" of E. Wilson's and Kendrick's bus-driving related tardiness; there is only Hinds' testimony.

Furthermore, although Jordan claims she had several conversations with Kendrick and E. Wilson about their tardiness [Jordan Depo. at 60-63], Jordan does not know whether a Front-End Manager was aware of their alleged continued tardiness [id. at 64] or whether either ever accumulated six points during any six-month period despite receiving approval for any tardies related to bus-driving. [Id. at 69-70]. However, this information is only obtainable by reference to the computer-generated attendance reports, which Wal-Mart failed to preserve, despite its obligation to do so under 29 C.F.R. § 1602.14(a). Presumably, this information would have been favorable to plaintiff.

### Reba Hagerty

Plaintiff has identified Reba Hagerty as a comparator, another employee for whom Wal-Mart has submitted no records. Though Hagerty's job title was that of Customer Service Manager, she was an hourly employee subject to the same attendance policy as plaintiff. The difference in job title is irrelevant. The relevant inquiry is not whether the plaintiff and the would-be comparator have the same job title but whether they are subject to the same employment policies. Lathem v. Dept. of Children and Youth Services, 172 F.3d 786, 793 (11th Cir. 1999). Both cashiers and customer service managers are subject to the Wal-Mart attendance policies. There is no written policy indicating that

28

cashiers and customer service managers are subjected to different standards of discipline. Therefore, Hagerty is a proper comparator.

Jordan estimates that Hagerty was tardy three times a week. [Jordan Depo. at 69]. Rather than terminate her, Hinds testified that she demoted Hagerty because of her attendance problems and that her attendance and attitude improved thereafter. [Plaintiff's Exh. 4, Hinds Decl. at ¶ 9]. While Jordan admittedly did not know whether Hagerty accumulated six points in any rolling six-month period [Jordan Depo. at 69], or whether any of her tardies were excused [*id.* at 71], this information was easily obtainable by reference to the computer-generated attendance and tardy reports which Wal-Mart failed to preserve. Because the court finds that Wal-Mart had an obligation to maintain this information under 29 C.F.R. § 1602.14(a), it infers that this information would have been favorable to plaintiff.

### Martha Medders

The same is true with regard to comparator Martha Medders. Jordan knows she was frequently late, but the records which would reflect how often this occurred were not preserved. Applying the adverse inference that Medders' records would have shown her to be similarly situated with plaintiff, the court finds that she is a valid comparator and that her records would have shown that she was treated more favorably than plaintiff despite having a similar or worse attendance history.

### Susan Forister and Judie Hartson

Records submitted reflect that another employee, Susan Forister, was given a Decision-Making Day by Hinds on March 11, 1998, when she had 22 points. [Plaintiff's Exh. 12]. This is no different treatment than that received by Jordan, who was given a Decision-Making Day on January 10, 1998, after accruing 21 points. [Jordan Depo. at Exh. 10]. The absence of the Wal-Mart attendance records is immaterial to this finding, given that there are sufficient other records to reach this conclusion.

Likewise, Judie Hartson received a written coaching from Hinds on May 27, 1998, when she had six points. [Plaintiff's Exh. 13]. Jordan received a written coaching on May 7, 1997, when she had 17 points accrued. [Jordan Depo. at Exh. 12]. Despite the absence of the Wal-Mart attendance records for Hartson, the available records reflect that Jordan was not treated more harshly than Hartson.

Because the records which would either affirm or disprove plaintiff's claims, that Evelyn Wilson, Kendrick, Hagerty and Medders were frequently late but not disciplined, were not maintained by Wal-Mart despite being on notice of plaintiff's claim, the court makes an inference that these records would have supported plaintiff's claims. Therefore, the court concludes that she has established a *prima facie* case of discrimination with regard to these comparators.

## **Legitimate, Non-Discriminatory Reason**

When the plaintiff has established a *prima facie case* of discrimination, the employer then has the burden of producing--but not proving--an explanation to rebut the *prima facie* case--that the adverse employment action was taken for legitimate, nondiscriminatory reasons. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) ("'[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action."). Normally, the defendant's burden is relatively light, *see Perryman v. Johnson Products Co.*, 698 F.2d 1138 (11th Cir. 1983), but the defendant still must produce clear and reasonably specific evidence of an asserted legitimate reason for its employment decision. *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096; *IMPACT v. Firestone*, 893 F.2d 1189 (11th Cir. 1990); *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769 (11th Cir. 1982).

Wal-Mart alleges that, assuming the existence of a *prima facie* case of discrimination, it has a legitimate, non-discriminatory reason justifying plaintiff's discharge. It asserts that Hinds terminated Jordan because of her continued attendance problems.

According to Jordan, because the issue of whether plaintiff was in violation of Wal-Mart's attendance policy was litigated in Jordan's favor in her

31

unemployment compensation case, Wal-Mart is collaterally estopped from asserting this as a legitimate, non-discriminatory reason for her termination. Jordan cites *Wal-Mart Stores, Inc. v. Smitherman*, 743 So.2d 442 (Ala. 1999), as authority for this proposition. Plaintiff's reasoning is flawed for several reasons.

The *Smitherman* court held that an employee was collaterally estopped from relitigating in state court the findings made by an unemployment-compensation-appeals referee and thus could not establish a *prima facie* case for retaliatory discharge. *Id.* at 443. Under Alabama law, the doctrine of collateral estoppel applies to issues raised at an administrative proceeding if five elements are present: (1) identity of the parties or their privy; (2) identity of the issues; (3) an adequate opportunity to litigate the issues by the parties in the administrative proceeding; (4) actual litigation of issues to be estopped; and (5) necessity of the findings on the issue to be estopped to the administrative decision. *Id.* at 444.

In *Smitherman*, the plaintiff alleged that she was illegally fired by her employer, Wal-Mart, in retaliation for filing a workers' compensation claim. Wal-Mart claimed that Smitherman was fired for violations of its employment policy, namely, making profane and derogatory remarks about a manager in the presence of co-workers. Following her termination, Smitherman filed for unemployment compensation benefits and was partially disqualified from receiving them under § 25-4-78(3)(c), *Alabama Code* (1975). That section

32

provides for reduced benefits if the employee was "discharged from [her] most recent bona fide work for misconduct connected with [her] work" without prior warning for previous instances of similar misconduct. Smitherman appealed the examiner's determination to an appeals referee, who affirmed the original decision. *See id.* at 443-44. Before a final determination had been made on her unemployment benefits claim, Smitherman filed an action against Wal-Mart in state court seeking damages for a retaliatory discharge. The Alabama Supreme Court found the elements of collateral estoppel had been met. Identity of issues existed because the administrative hearing considered the reasons for Smitherman's discharge, reasons that she necessarily needed to prove in order to survive summary judgment in her retaliation case. In particular, it would have been necessary for Smitherman to prove that the reason proffered by Wal-Mart for her termination was pretextual and that also was the subject of her benefits hearing. *Id.* at 445.

The difference between *Smitherman* and this case is that the defendant in *Smitherman* sought to bar the plaintiff from relitigating an issue she lost in a prior case; whereas, in this case, it is the plaintiff that seeks to bar the defendant from relitigating an issue. Collateral estoppel may be used either way; that is, by a defendant to preclude the plaintiff from relitigating an issue he has lost in a prior case ("defensive" collateral estoppel) or by a plaintiff to preclude the defendant from relitigating such an issue ("offensive" collateral estoppel). *Deweese v. Town of Palm Beach*, 688 F.2d 731 (11th Cir. 1982).

33

Plaintiff seeks to apply offensive collateral estoppel in this case. Offensive use was approved in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). However, the Supreme Court noted that the application of offensive collateral estoppel must be allowed with great discretion. Fairness to both parties must be considered where it is applied. The Supreme Court expressly stated that "where the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Id.* at 331, 99 S.Ct. at 651. Of primary importance is whether the opposing party had an adequate *incentive* to litigate vigorously in the previous proceeding and whether he received a full and fair hearing in that proceeding. Once the litigant has had a full and fair opportunity to litigate his claim, the trial court has broad discretion in deciding whether offensive collateral estoppel is appropriate. *Id.*; *see also*, *Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d 663, 66-66 (11th Cir. 1984).

In *Parklane*, the Supreme Court listed four standard objections to the doctrine of offensive collateral estoppel, stating that the use of offensive collateral estoppel should be denied for these reasons or for others where application would be unfair. *Parklane*, 439 U.S. at 330-31, 99 S.Ct. at 651. In particular, the court stated:

> A second argument against offensive use of collateral estoppel is that it may be unfair to a defendant. If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not

34

> foreseeable. *The Evergreens v. Nunan*, 141 F.2d 927,
> 929 (CA2); *cf. Berner v. British Commonwealth Pac.
> Airlines*, 346 F.2d 532 (CA2) (application of offensive
> collateral estoppel denied where defendant did not
> appeal an adverse judgment awarding damages of
> $35,000 and defendant was later sued for over $7
> million).

*Id.* at 330, 99 S.Ct. at 651.

The court finds that this argument has application to the present case.

There was little incentive for Wal-Mart to appeal the loss of this issue before the

unemployment compensation referee. The stakes are much higher now.

Furthermore, at the time of the referee's decision, the Alabama Supreme Court

had not yet decided *Smitherman*. Thus, Wal-Mart was not on notice that its

failure to pursue an appeal of the referee's decision could have a preclusive

effect on the issue of whether plaintiff's dismissal was validly based on her

violation of the Wal-Mart attendance policy. Therefore, the court finds that the

application to the doctrine of offensive collateral estoppel is inappropriate in this

instance. *See University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220,

92 L.Ed.2d 635 (1986) (Congress did not intend to give preclusive effect to

unreviewed state administrative agencies in Title VII cases). *See also, Delgado

v. Lockheed-Georgia Co.*, 815 F.2d 641, 646-47 (11th Cir. 1987) (plaintiffs

were not barred by unreviewed state unemployment agency from re-litigating

whether they had, in fact, been discharged for falsifying time records or were

the victims of discrimination because the purpose of the state unemployment

agency was to speedily determine eligibility to unemployment compensation

and not to enforce the state's discrimination laws; because of the narrow focus of the agency's investigation, the plaintiffs did not have adequate opportunity to litigate the discrimination claims before it).

In any event, it is immaterial whether Jordan actually violated Wal-Mart policy. The law is clear that, even if a Title VII claimant did not in fact commit the violation with which she is charged, an employer successfully rebuts any *prima facie* case of disparate treatment by showing that it honestly believed the employee committed the violation. *See Chaney v. Southern Ry. Co.*, 847 F.2d 718, 723-24 (11th Cir. 1988) (focusing disparate treatment inquiry on whether employer had "reason to believe" employee was trying to cover up on-duty marijuana use); *Nix*, 738 F.2d at 1186 ("'[I]f an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown.'") (quoting *Chescheir v. Liberty Mutual Ins. Co.*, 713 F.2d 1142, 1148 (5th Cir. 1983)); *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977) ("Even if [employer] wrongly believed that [Title VII claimant] violated this policy, if [employer] acted on this belief it was not guilty of racial discrimination"). The record evidence reflects that Hinds, the Front-End Manager who actually terminated Jordan, actually believed that Jordan had violated the Wal-Mart attendance policy and had done so repeatedly and after having been warned not to continue to do so.

36

## Pretext

Once an employer has provided a legitimate, non-discriminatory reason for its actions, if the plaintiff is to prevail, she then must establish, by a preponderance of the evidence, that the employer's articulated reason was a pretext for discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *Chaney*, 847 F.2d at 722; *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1499 (11th Cir. 1985). Thus, the burden now shifts back to plaintiff to raise a genuine factual question as to whether defendant's stated reason is mere pretext. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993). The plaintiff may succeed by directly persuading the court at trial that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *McDonnell Douglas*, 411 U.S. at 804-05, 93 S.Ct. at 1825-26.

In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the *prima facie* case. *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 732 (9th Cir. 1986). Evidence already introduced to establish the *prima facie* case may be considered, and "[i]ndeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation" and establish pretext. *Burdine*, 450 U.S.

37

at 256 n.10, 101 S.Ct. at 1095 n.10. Accordingly, the grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable in Title VII cases in which the plaintiff has established a *prima facie* case because of the "elusive factual question" of intentional discrimination. *Id.* at 256, 101 S.Ct. at 1095.

According to plaintiff, pretext is shown by her assertion that she was treated in a different manner than similarly situated employees who accrued enough points to be terminated but were not. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. To prevail on this ground, plaintiff must show that the comparative employees are "in involved in or accused of the same or similar conduct" and yet are disciplined in a different, more favorable manner. *Holifield*, 115 F.3d at 1562. The conduct must be of comparable seriousness. *Id.* at 1563.

The same evidence offered by Jordan to make out her *prima facie* face of discrimination also reflects a genuine issue of fact as to pretext. Jordan alleges personal knowledge that several named comparators had worse attendance records than hers and were not terminated. Wal-Mart responds by stating that plaintiff has not shown the disciplinary history of these employees, the number of points accrued or whether any of these absences were excused by management. [Doc. #13, Exh. 5, Brief of Defendant, at 22]. Wal-Mart avers that "Jordan cannot identify any Caucasian employee similarly situated to her

38

who was not terminated after repeated attendance and tardiness violations and after receiving a Decision-Making Day." [*Id.* at 25].

While, as a general rule, the burden is on the plaintiff "to show a similarity between [her] conduct and that of white employees who were treated differently and not on [the defendants] to disprove their similarity," *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 603 (8th Cir. 1983), *cert. denied*, 469 U.S. 847, 105 S.Ct. 160, 83 L.Ed.2d 97 (1984), there is a problem with applying this rule to the present case because the only way Jordan could offer such proof would be to introduce the attendance records of her comparators, which are records Wal-Mart failed to maintain in violation of 29 C.F.R. § 1602.14(a). This, and this alone, tips the summary judgment scale in Jordan's favor. Given the lack of substance that exists with regard to the comparators Jordan names for whom sufficient attendance-related records do exist, it is tempting to conclude that the remaining, unavailable records also would contain no evidence of value to Jordan. However, as set out above, the court must infer that the contents of these records would have been favorable to Jordan. Accordingly, although she prevails by the thinnest of margins, Jordan has provided evidence from which a fact-finder could conclude that the reason for her termination proffered by Wal-Mart is pretextual. Therefore, defendant's motion for summary judgment is due to be denied because of the existence of genuine issues of material fact.

39

A separate order in conformity with this memorandum opinion will be entered contemporaneously herewith.

DONE this _____24th____day of February, 2004.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

40